# THE STATE OF NEW HAMPSHIRE
## JUDICIAL BRANCH
### SUPERIOR COURT

Rockingham Superior Court
Rockingham Cty Courthouse/PO Box 1258
Kingston NH 03848-1258

Telephone: 1-855-212-1234
TTY/TDD Relay: (800) 735-2964
http://www.courts.state.nh.us

## NOTICE OF DECISION

**File Copy**

Case Name: **Robin Gray v Charles Bolduc, Ind & dba Charles Bolduc Excavation, LLC**
Case Number: **218-2018-CV-00067**

Enclosed please find a copy of the court's order of March 11, 2020 relative to:

Defendant's Motion for Summary Judgment

March 13, 2020

Jennifer M. Haggar
Clerk of Court

(595)
C: Bartram C. Branch, Jr., ESQ; Christopher J. Poulin, ESQ

# The State of New Hampshire

**ROCKINGHAM**                                                                 **SUPERIOR COURT**

ROBIN GRAY

V.

CHARLES BOLDUC

AND

CHARLES BOLDUC EXCAVATION, LLC

NO. 218-2018-CV-00067

**ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

The plaintiff, Robin Gray, brings this action against the defendants, Charles Bolduc and Charles Bolduc Excavation, LLC (collectively, "Bolduc"). See Compl. (Doc. 1). The action arises out of a slip and fall Gray suffered on a patch of ice on the premises of her then-place of employment on December 19, 2016. At the time of the incident, Bolduc had orally contracted with Gray's then-employer, James Breen, to render certain winter maintenance services for the premises during the winter of 2016. Gray alleges that Bolduc negligently breached his duty of care to her by failing to maintain the premises free of unreasonably dangerous conditions. Bolduc now moves for summary judgment. See Bolduc's Mot. Summ. J. (Doc. 19). Gray objects. See Gray's Obj. (Doc. 23). For the reasons that follow, Bolduc's motion for summary judgment is GRANTED.

## Standard of Review

When reviewing a motion for summary judgment, the Court "consider[s] the evidence in the light most favorable to the nonmoving party and, if no genuine issue of material fact exists, [the Court] determine[s] whether the moving party is entitled to

1

judgment as a matter of law." Grady v. Jones Lang LaSalle Constr. Co., Inc., 171 N.H. 203, 206 (2018). The moving party bears the burden of establishing that there are no genuine questions of material fact and that it is entitled to judgment as a matter of law. Iannelli v. Burger King Corp., 145 N.H. 190, 192 (2000). The Court "cannot weigh the contents of the parties' affidavits and resolve factual issues." Id. at 193. Rather, the Court "must determine whether a reasonable basis exists to dispute the facts claimed in the moving party's affidavit[s] at trial." Id. In order to defeat a motion for summary judgment, the non-moving party "must put forth contradictory evidence under oath sufficient to indicate that a genuine issue of material fact exists." Brown v. Concord Grp. Ins. Co., 163 N.H. 522, 527 (2012). "An issue of fact is material if it affects the outcome of the litigation." Porter v. City of Manchester, 155 N.H. 149, 153 (2007).

## Facts

The following facts are drawn from the materials submitted by the parties in support of their pleadings. Unless otherwise noted, the facts are uncontested. In 2004, Breen purchased property in Fremont ("Fremont Property") and began operating Fremont Storage, LLC ("Fremont Storage"), which rented storage units to individuals, on a portion of the Fremont Property. Doc. 19 Ex. A (Breen Dep.) at 7:3–7:17. In addition to Fremont Storage, there were two other businesses on the Fremont Property. Id.; id. Ex. B (Gray Dep.) at 21:22–22:9. All three of the businesses shared a front parking lot. Id. at 48:2–48:4. Fremont Storage consisted of five buildings containing storage units separated by unpaved gravel (the "Storage Premises"). Id. Ex. A at 7:3–7:17; id. Ex. B at 48:8–48:12. Gray began working at Fremont Storage as an office manager on January 1, 2005. Doc. 23 Ex. 3. At the time of her accident, she worked at Fremont

Storage six days a week, for approximately four hours per day. Doc. 19 Ex. A at 53:20–54:3; id. Ex. B at 7:23. Although he was the owner, Breen was only on the Fremont Property a couple of times per week. Id. Ex. A at 20:3–20:7.

The winter conditions on the Storage Premises were generally poor. As noted above, the grounds of the Storage Premises were not paved. There were many divots on the unpaved gravel throughout the Storage Premises. Id. at 15:11–15:14. In addition, the buildings on the Storage Premises had pitched roofs and melting snow and ice would often fall from the roofs and onto the gravel below. Id. at 43:9–43:16. As a result, the Storage Premises were subject to a constant cycle of snow thawing and refreezing. Ice would particularly accumulate around the storage buildings and in the divots. Id. Ex. B at 40:23–41:13, 43:21–43:23. In general, whenever there was a winter storm or it was cold, there would be ice around the buildings. Id. at 44:12–44:17.

Prior to Breen's purchase of the Fremont Property, Bolduc provided winter maintenance services to its previous owner. Id. Ex. A at 18:8–18:9. Upon Breen's purchase, Bolduc continued to provide winter maintenance services pursuant to an oral contract between Bolduc and Breen (the "Agreement").[1] Id. at 39:10–40:5. Under the Agreement, Breen expected Bolduc to plow snow throughout the Fremont Property, as well as shovel every doorway and aisle between the storage buildings on the Storage Premises to ensure that patrons had constant access to their units. Id. at 40:11–40:19. This level of involvement was greater than Bolduc's responsibilities with the previous owner. Id. Pursuant to the Agreement, Bolduc would send Breen a bill once a year that

---

[1] Bolduc initially provided winter maintenance services at the Fremont Property as a sole proprietor. See Doc. 19 Ex. D (Bolduc Aff.) ¶ 5. Starting in 2016, he began operating as Charles Bolduc Excavation, LLC. Id. As the parties do not attribute any significance to this distinction, neither will the Court.

3

listed all of the times Bolduc had visited the Fremont Property. Id. at 39:10–39:23. The total charges were based on the number of visits. Id.

The exact terms of the Agreement are disputed in this case. According to Breen and Bolduc, the central term of the Agreement was that Bolduc would automatically provide services at the Fremont Property in the aftermath of winter precipitation.[2] Breen expected Bolduc to be at the Fremont Property at 9:00 A.M. if there was any amount of "plow-able" snow, id. at 42:1–42:4, and to follow up throughout the day to ensure that snow was not blocking access for the customers of any of the businesses, including those with storage units, see id. at 38:19–39:9. However, Breen did not expect Bolduc to come to the Fremont Property if there was only a "dusting" of snow. Id. at 42:23–43:1. In addition, Breen did not expect Bolduc to conduct a "daily inspection" of the Fremont Property. Id. at 20:13–20:17. Breen did not believe such a requirement was realistic because Bolduc provided services for multiple properties. Id. at 20:17–20:18. Nonetheless, Breen testified that Bolduc "would occasionally swing by [the Fremont Property] to check on the facility [in the absence of winter precipitation] . . . [b]ut [that] it was [neither] required . . . [n]or expected of him." Id. at 44:16–44:18; see also Doc. 23 Ex. 2 (letter from Breen to Gray's counsel dated Aug. 30, 2017) ("There is no doubt that . . . Gray and I have seen . . . Bolduc drive through the facility on many occasions when there has been no snowfall and no call has been made . . . . He does sometimes just drive through to check to see if anything needs to be addressed.").

---

[2] As there is no written contract, Breen and Bolduc do not use standard terminology in referring to the type of condition that would require Bolduc to automatically provide services at the Fremont Property under the Agreement. Bolduc represents that he was required to provide services after an "ice or plow-able snow event" — which meant levels of snow greater than a "dusting." Doc. 19 Ex. D ¶¶ 9–11. Breen similarly characterized the requisite weather conditions as snowfall that resulted in a level of snow that could be plowed, an amount greater than a "dusting." Id. Ex. A at 42:19–43:1. For clarity, the Court will refer to such weather conditions as "winter precipitation."

4

In terms of salting and sanding, Breen expected Bolduc to "automatically" salt and sand the Fremont Property if it was "something that was obvious and needed to be done." Doc. 19 Ex. A at 43:17–43:23. However, Breen testified that it was unlikely Bolduc would salt and sand in the absence of winter precipitation because he was not required to come to the Fremont Property in those circumstances and would thus be unaware of any icy conditions. Id. at 43:21–44:6. If Breen desired Bolduc's services in the absence of winter precipitation, it was Gray or Breen's responsibility to call and tell Bolduc that salting and sanding was necessary. Id. at 43:23–44:16; see also id. at 63:20–64:9 (Breen noting that "automatic salting and sanding" would "typically" be done "in conjunction with a snow event . . . .").

Bolduc's understanding of the Agreement was consistent with Breen's. In other words, he understood that, per the Agreement, he was only required to automatically plow, shovel, and salt and sand the Fremont Property after the occurrence of "an ice event or plow-able snow event." Id. Ex. D. ¶ 9. Bolduc did not understand the Agreement to require him to inspect for or remediate unsafe conditions at the Fremont Property in the absence of winter precipitation. Id. ¶ 12.

For her part, Gray understood that Bolduc was "supposed to maintain a working environment for customers . . . he [was] supposed to plow, sand, salt, and keep [the Fremont Property] maintained throughout the winter . . . ." Id. at 130:2–130:6; see also Doc. 23 at 4 (Gray Aff.). Gray testified that Bolduc always plowed and removed snow in a timely fashion after a storm. Id. at 61:4–61:11. On the other hand, Gray is not aware of any time that Bolduc salted and sanded the Storage Premises in the absence of winter precipitation. Id. at 66:17–67:4. Further, Gray was unaware if Breen ever

instructed Bolduc to regularly salt and sand the Storage Premises even when precipitation had not occurred. Id. at 53:13–53:16. Gray testified that if she observed dangerous conditions on the Storage Premises that she felt needed to be addressed, she would call Breen, who would in turn instruct her to call Bolduc. Id. at 67:5–67:10. In those circumstances, Gray would inform Bolduc that the Storage Premises had not "been done yet" and would ask him when he would be arriving. Id. at 68:9–68:16. She would not tell him specifically what to do because "he kn[ew] his job." Id. Gray does not recall any instance in which Bolduc failed to provide services for the Fremont Property after being asked to do so. Id. at 69:9–69:22.

One of Gray's responsibilities as office manager was to conduct a daily walkthrough of the Storage Premises. Id. at 12:3–12:13. The main purpose of the walkthroughs was for Gray to check on the units and regulate customer access, including by placing locks on units with owners delinquent in their payments. Id. Ex. A at 14:23–15:13. In addition, Gray was to inspect the Storage Premises to make sure they were safe. Id. Ex. B at 14:9–13:13. If there was anything on the Storage Premises rendering them unsafe, Gray would call Breen to inform him. Id. at 14:14–14:16. During the winter months, Gray would occasionally use her car to conduct the walkthroughs, generally when there was a foot or more of snow on the ground or it was very cold. Id. at 28:11–29:21.

On December 19, 2016, Gray arrived at Fremont Storage at about 11:45 A.M. Id. at 74:6–74:12. Gray recalls that it was very cold that day. Id. at 75:17–78:2. Due to the temperature, Gray conducted the walkthrough using her car. Id. at 78:11–79:1. She arrived at a building that had two units that needed to be locked and exited her

6

vehicle in order to do so. Id. at 79:3–79:8; 95:8–95:13. After locking the first unit and turning to walk towards the second, she slipped and fell on ice that had accumulated in one of the many divots on the Storage Premises. Id. at 79:3–79:8; 95:8–95:13. After she fell, Gray got back into her car and ultimately went to a hospital. Id. at 114:7–115:14. On the way to the hospital, Gray called Breen and told him that Bolduc "did not come and do his job . . . . The facility isn't done." Id. at 115:19–116:20.

There was no winter precipitation on December 19 or December 18, 2016. Id. Ex. D ¶ 15; see also id. Ex. B at 85:23–86:5, 87:10–87:14 (Gray does not remember when it last snowed, but does remember that it was not snowing on December 19). However, there was a snowstorm on December 17, and Bolduc provided snow removal services during that storm. Id. Ex. D ¶ 16.

## Analysis

Bolduc now moves for summary judgment. He argues that he cannot be found negligent in this case because he did not owe a duty to Gray to maintain the Fremont Property on the date of her fall. Doc. 19, Mem. of Law at 8; see also Coan v. N.H. Dep't of Envtl. Servs., 161 N.H. 1, 7 (2010) (plaintiff must show that defendant owed her a duty to prevail on negligence claim). In making this argument, Bolduc asserts, and Gray does not dispute, that his liability to Gray is determined by Section 324A of the Restatement (Second) of Torts. See Doc. 19, Mem. of Law at 8; see also Bloom v. Casella Constr., Inc., No. 2018-0425, 2019 WL 5199345, at *3 (N.H. Oct. 19, 2019) (adopting Section 324A for the purposes of determining the liability of snow plow contractors to third parties). Section 324A provides:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a

7

> third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>
> (a) his failure to exercise reasonable care increases the risk of such harm;
>
> (b) he has undertaken to perform a duty owed by the other to the third person; or
>
> (c) the harm is suffered because of reliance on the other or the third person upon the undertaking.

Restatement (Second) of Torts § 324A, at 142 (1965).

Gray objects to Bolduc's motion on the sole ground that Bolduc assumed a duty to Gray to maintain the Fremont Property free of unreasonably dangerous conditions under the Agreement. See Doc. 23 ¶ D; id., Mem. of Law at 2, 4–5. Thus, although Gray does not specify under which subsection she is asserting liability, Gray's theory of liability appears to rest on Section 324A(b). Section 324A(b) "comes into play as long as the party who owes the plaintiff a duty of care has delegated to the defendant any particular part of that duty." Canipe v. Nat'l Loss Control Serv. Corp., 736 F.2d 1055, 1062 (5th Cir. 1984); see also Plank v. Union Elec. Co., 899 S.W.2d 129, 131 (Mo. Ct. App. 1995) (purpose of 324A(b) is "to place liability upon a party who has clearly undertaken primary responsibility for services upon which third parties depend").

There is no question that Breen, as owner of the Fremont Property, owed a duty to Gray to maintain the premises free from unreasonably dangerous conditions. See Rallis v. Demoulas Super Markets, Inc., 159 N.H. 95, 99 (2009). Thus, in order for Section 324A(b) to "com[e] into play," Breen must have delegated this duty to Bolduc. Canipe, 736 F.2d at 1062. As noted above, Gray maintains that Breen did so through the Agreement. Here, it is undisputed that Bolduc had a duty to provide winter

8

maintenance services at the Fremont Property in response to winter precipitation pursuant to the Agreement. However, Gray does not argue that Bolduc was negligent for failing to provide winter maintenance services in response to winter precipitation. Rather, Gray maintains that Bolduc was required to maintain the Fremont Property free of unreasonably dangerous winter conditions at all times, and that he was thus obligated to remediate the icy conditions on the Storage Premises even in the absence of winter precipitation — including on December 19, 2016. See Doc. 23 ¶D; id., Mem. of Law at 4. Thus, the question before this Court is whether Breen delegated his duty to maintain the Fremont Property free of unreasonably dangerous conditions in all circumstances to Bolduc through the Agreement.

The Court finds that Breen did not do so. As a threshold matter, the two contracting parties in this case, Breen and Bolduc, are not in dispute on this central question. Breen has consistently represented that he did not expect Bolduc to provide winter maintenance services in the absence of winter precipitation. See, e.g., Doc. 19 Ex. A at 20:13–20:17. Bolduc has represented similarly. Id. Ex. D. ¶¶ 9, 12. Therefore, the two parties to the Agreement, and thus those with the power to enforce it, both agree that Bolduc was not obligated to provide services at the Fremont Property in the absence of winter precipitation.

Nevertheless, Gray maintains that the terms of the Agreement, which is an oral contract, are unclear and thus cannot be determined at the summary judgment stage of the proceedings. Doc. 23, Mem. of Law at 2. Gray makes three arguments in support of this contention. First, she argues that the terms of an oral contract must be determined by examining the contracting parties' course of conduct, and that Bolduc's

9

conduct suggests that the Agreement may have required him to provide winter maintenance services even in the absence of winter precipitation. Id. at 1–3. Second, Gray contends that Breen may have been unaware of the exact terms of the Agreement. Id. at 3–4. Third, she argues that Breen's testimony as to the scope of the Agreement is unreliable because he does not support Gray's lawsuit against Bolduc and may thus be biased against her. Id. at 3. The Court will consider each argument in turn.

Gray's first argument is that Bolduc's obligations under the Agreement cannot be determined on the summary judgment record because the terms of oral contracts must be ascertained by looking at the parties' actions in addition to their representations. In support of this argument, Gray cites to Tridenti v. Site Structuring Landscaping, Inc., No. 218-2015-CV-00379, Rockingham Cnty. Super. Ct., at *5 (Oct. 28, 2016) (Order, Wageling, J.), in which the court denied a contractor's motion for summary judgment because "the [oral] contract was never memorialized in writing, and the summary judgment record d[id] not establish the exact terms of the [c]ontract and/or the specific duties it imposed" on the contractor. In support of applying the Tridenti ruling to this case, Gray points to: (1) Breen's deposition testimony in which he stated that "automatic salting and sanding" would "typically" (as opposed to exclusively) be done in "conjunction with a snow event . . ."; and (2) a letter from Breen in which he stated that Bolduc would occasionally inspect the Fremont Property and provide winter maintenance services in the absence of winter precipitation. Doc. 23, Mem. of Law at 2–3. These statements, Gray maintains, suggest that Bolduc would occasionally

10

automatically salt and sand the Fremont Property on an as-needed basis, implying that such conduct might therefore have been part of the Agreement. Id. at 3.

The Court does not agree. A contract is a legally enforceable exchange of promises between two or more parties. Restatement (Second) of Contracts § 1 (1981). The parties to a contract are the masters of the agreement, and — with limited exceptions — are free to contract to whatever terms they choose. See id. § 5, cmts. a and b. It is true that when parties to an oral contract dispute its terms, courts may look to the acts of the parties to determine its scope. See O'Donnell v. Cray, 109 N.H. 223, 225 (1968). However, where an oral contract's "terms . . . are not in dispute, . . . its construction is to be treated as a matter of law, the same as in contracts reduced to writing." McDonald v. Texcraft Prods. Co., 91 N.H. 411 (1941). In other words, the parties to an oral contract are free to agree to whatever terms they choose and unless there is a dispute as to those terms, a court must treat their contract as unambiguous. Accordingly, the undisputed terms of a private contract cannot be changed because the parties occasionally performed acts outside of their contractual obligations where neither party wished to change the terms of the contract. Here, although Breen has acknowledged that Bolduc occasionally came to the Fremont Property to provide winter maintenance services in the absence of winter precipitation, he has repeatedly stated that Bolduc was not required to do so under the terms of the Agreement. See e.g., Doc. 19 Ex. A at 44:16–44:18. Bolduc similarly understood that he was not required to provide services at the Fremont Property unless it was in response to winter precipitation. Id. Ex. D. ¶¶ 9, 12. Thus, the relevant term in the Agreement is not in

11

dispute, and the Court does not have to look to the acts of the parties to determine its scope.

Gray's second argument is that Breen was less familiar with the terms of the Agreement than was Gray because: (1) Breen essentially resumed the contractual relationship between Bolduc and the previous owner of the Fremont Property; (2) Breen was not at the Fremont Property on a consistent basis; and (3) Gray was at the Fremont Property almost every day. Doc. 23, Mem. of Law at 3–4. The Court again disagrees. As an initial matter, the record does not support the contention that Breen was unaware of the terms of the Agreement for two reasons. First, upon assuming ownership of the Fremont Property, Breen altered Bolduc's responsibilities in order to better comply with the needs of Fremont Storage. See Doc. 19 Ex. A at 40:11–40:19. Second, Breen testified repeatedly as to when Bolduc was expected to come to the Fremont Property, and never testified that he was unaware of what the Agreement required. Taken together, these facts establish that Breen played an active part in forming the Agreement and understood its terms throughout its existence.

In any case, Gray's contention that the Agreement could contain terms of which Breen was unaware is misguided. The Agreement was between Breen and Bolduc. Gray's list of responsibilities makes clear that Breen did not delegate any authority to her to enter into or alter the scope of the Agreement with Bolduc. See Doc. 19 Ex. C (Gray's list of work tasks). Thus, the scope of the Agreement is based on Breen's and Bolduc's mutual understanding of its terms. See Chisholm v. Ultima Nashua Indus. Corp., 150 N.H. 141, 144–45 (2003) ("[T]here must be a meeting of the minds in order to form a valid contract . . . . A meeting of the minds is present when the parties assent

to the same terms." (citations omitted)).  Therefore, the only enforceable terms in the Agreement were those mutually understood and recognized by the contracting parties — Breen and Bolduc.  As neither Bolduc nor Breen understood the Agreement to require Bolduc to provide services in the absence of winter precipitation, such a term did not exist.

Finally, Gray contends that Breen does not support her personal injury lawsuit and that his bias may have compelled him to testify that the Agreement was more limited than it was in reality.  Doc. 23, Mem. of Law at 3.  Gray maintains that "a jury could [therefore] find" that his beliefs on the matter "taint his perceptions of [Bolduc's] obligations."  Id.  The Court does not agree that Gray's bare allegation of bias creates a question of material fact as to whether Breen is lying about the scope of the Agreement.  While a fact finder may consider witnesses' biases in determining their credibility, almost every deponent or affiant will have some bias in a particular case.  Thus, such biases do not independently create a reasonable basis to dispute deponents' testimony where it is uncontroverted or otherwise supported by the record.  Notably, Breen's representations as to the scope of the Agreement are in accord with the evidence in the record in this case.  For example, both Breen and Bolduc represent that Bolduc consistently provided winter maintenance services at the Fremont Property in response to winter precipitation.  Breen has also consistently stated that Bolduc would only occasionally come to the Fremont Property in the absence of winter precipitation and that these were exceptions to his general course of conduct.  The consistency with which Bolduc came to the Fremont Property after it snowed, in comparison to his sporadic visits in the absence of such conditions, comport with Breen's representation

13

that Bolduc was only contractually required to provide services in the former but not the latter.

In contrast, Gray has pointed to no facts in the record that contradict Breen and Bolduc's representations. In fact, Gray stated in her deposition that she did not know whether Bolduc ever came to the Fremont Property on his own in the absence of winter precipitation. Doc. 19 Ex. B at 66:17–66:23. At the same time, the record does support that Gray understood the Agreement to require Bolduc to maintain the Fremont Property at all times. See, e.g., Doc. 23 at 4. As noted above, however, Gray was not a party to the Agreement. Thus, her understanding of the Agreement, unsupported by facts, is not determinative of its scope and is not enough on its own to create a question of fact on the issue. Therefore, even assuming that Breen is biased against personal injury lawsuits, the record fully supports his representation as to the Agreement's scope and does not present a question of fact on the issue.

In light of the foregoing, the Court finds that the record conclusively establishes that Bolduc did not have an obligation to provide winter maintenance services on the date of Gray's slip and fall. Therefore, Bolduc did not assume a duty to Gray under Section 324A(b). Absent the existence of a duty, Gray cannot recover for negligence.

## Conclusion

For the reasons provided above, Bolduc's motion for summary judgment is GRANTED.

SO ORDERED.

3/11/2020
DATE

Daniel St. Hilaire
Presiding Justice

14